IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
MAR 20 2009
AT____O'CLOCK____
Lawrence K. Baerman, Clerk - Syracuse

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA

v.

THE CICERO LOCAL DEVELOPMENT
CORPORATION

Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Criminal No.
5:09-CR-159  (NAM)

PLEA AGREEMENT

ANDREW T. BAXTER, Acting United States Attorney for the Northern District of New York (by Michael C. Olmsted, appearing) and the CICERO LOCAL DEVELOPMENT CORPORATION (CLDC), (with David Burch, Esq., appearing) hereby enter into the following Plea Agreement regarding the disposition of certain criminal charges against the Defendants:

1.  In return for the consideration described below, CLDC agrees as follows:

    a.  At the time of the execution of this Plea Agreement, CLDC will provide all necessary corporate resolutions and other documents authorizing David Burch, Esq. to execute this Plea Agreement and a Waiver of Indictment on its behalf, to make admissions on behalf of the CLDC, and to undertake, on its behalf, all of the obligations and promises set forth in this Agreement.

    b.  The Defendant will waive Indictment and enter a plea of "Guilty" to Count 1 of Information 09-CR-159, charging CLDC with aiding, abetting, procuring, and counseling in the

filing of a false tax document, (Application for Tax Exempt Status, Form 1023), in violation of 26 U.S.C. Section 7206(2).

  c. The Defendant waives any defense or objection to the commencement of this prosecution to the extent that it may be time-barred by the applicable statute of limitations.

 2. <u>Potential Penalties</u>.  The CLDC understands that its guilty plea to Count 1 of the Information would subject it to the following potential statutory penalties:

  a. <u>Maximum fine</u>: $500,000.  (26 U.S.C. Section 7206)

  b. <u>Probation</u>: 5 years.  The organizations can be sentenced to a term of probation pursuant to 18 U.S.C. § 3561.

  c. <u>Special Assessment</u>:  The Defendant will be required to pay an assessment of $400, which is due and payable at or before the time of sentencing.  (18 U.S.C. § 3013)  The Defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $400, payable to the U.S. District Court at the time of sentencing.

  d. <u>Interest and penalties</u>:  Interest and penalties may accrue, as a matter of law, on any unpaid financial obligation imposed as part of the Defendant's sentence, from as early as the date of sentencing.

 3. In order to facilitate the collection of any financial obligations to be imposed in connection with this prosecution, the CLDC agrees fully to disclose all assets in which it has any interest or over which it exercises control, directly or indirectly, including those held by a nominee or other third party.  The Defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs.  The Defendant promises that its financial statement and disclosures will be complete, accurate and truthful.

  a. The Defendant certifies that it has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that may be imposed upon them by the Court. In addition, the Defendant promises that it will make no such transfers in the future.

4. **Elements of the Offense.** The CLDC understand that the legal elements of the offense stated in 26 U.S.C. § 7206(2) are as follows:

  a. FIRST, that the defendant aided or assisted in, procured, counseled or advised the preparation or presentation of a document in connection with a matter arising under the internal revenue laws;

  b. SECOND, the return, claim or other document was false as to a material matter; and

  c. THIRD, that the defendant acted willfully.

5. **Factual Basis for the Plea.** The CLDC admits the following facts, which establish its guilt on the offense stated in 26 U.S.C. § 7206(2):

  a. THE CICERO CAMPUS PROJECT

   i. In or about 1984, residents of Cicero donated approximately 104 acres of land (the Meltzer Property) to the Town of Cicero for recreational development by the Town.

   ii. The Cicero Local Development Corporation [CLDC] was established in or about 1995 to facilitate development in the town of Cicero, New York.

   iii. In or about 1997 and 1998, the Cicero Town Supervisor, a State Assemblyman, and the Cicero Town Board undertook a project to use the donated land for a multi-use project that would include a community center, recreational facilities, municipal facilities, and

commercial and residential areas (the "Campus Project").

    iv.    On or about April 1, 1999, the Town of Cicero, the CLDC, and the MDF signed a Project Support Agreement. The Agreement established that the MDF (a) would provide staffing and expertise for the Project, (b) would hire consultants and professionals to assist in the Project, and (c) would seek out a Developer for the Project. The Town of Cicero agreed to transfer the property to the CLDC. The CLDC agreed to negotiate an appropriate agreement with the Developer recommended by the MDF, and to coordinate the development of a master plan for the Project.

    v.    On or about May 24, 1999, the 104-acre property was deeded from the Town of Cicero to the CLDC.

    b.    DEVELOPER SELECTION - UP FRONT COSTS

    i.    In or about May 1999, MDF issued a request for proposals for a developer for the Campus project. Between May and August, 1999, three developers submitted proposals, seeking fees between $450,000 and $1,200,000 to complete the project. At least two of these developers made clear they were willing to defer payment of costs and/or compensation until financing proceeds were available.

    ii.    Those bids were rejected and the MDA/MDF reported to the CLDC that the developers were unwilling to shoulder the risk of paying "up front costs."

    iii.    The State Assemblyman then introduced Marshall Breines and his firm, Hillspoint Wyatt, as a developer whom he claimed was interested in and capable of developing the Campus Project.

    iv.    Hillspoint Wyatt proposed a Developer agreement. The fee sought by

4

Hillspoint Wyatt included a 3% financial advisory fee and a 15% developer fee. Based upon Hillspoint Wyatt's projected cost for the Campus Project, the fee was estimated to be in excess of $3 million, substantially more than the two other prior proposals that were rejected. The fee was to be paid in two ways: Hillspoint Wyatt would receive $1.8 million at the time that financing was obtained for the Campus Project, and would be the beneficiary of a tax-exempt bond (identified as a "Series B" bond), in the amount of $1,350,000 which would pay them tax free interest payments over 40 years equal to $5,940,000. The Hillspoint Wyatt fee agreement contemplated that it would not receive any money for "up front costs" until financing was obtained.

  v. On or about January 20, 2000, following a report from the MDA/MDF, the CLDC agreed to select Hillspoint Wyatt as the Campus project developer, and signed an agreement that included the fee described above.

  c. THE INTERNAL REVENUE SERVICE INQUIRIES.

  i. Beginning in or about 2002, the Internal Revenue Service (IRS) undertook two investigations concerning the Cicero Campus Project. The first examined whether the Series A bonds and the Series B bonds should be tax-exempt (whether the interest payments to investors on the bonds should enjoy tax-exempt status) and the second examined an application filed by the CLDC to obtain tax-exempt status of the CLDC (whether the organization met the criteria for a tax-exempt organization).

  ii. On or about January 2002, the IRS began an audit of the bond offering to determine if tax-exempt treatment of the interest payments was appropriate.

  iii. It is material in the audit of tax-exempt bonds to determine if the proceeds of the bond were spent on a public purpose (allowing for tax-exempt treatment) or were

disproportionately paid to a private concern (in which case the tax-exempt treatment is disallowed). The presence of excessive private benefit will cause bonds initially deemed tax exempt to lose that status and become taxable bonds.

iv. In conducting this audit, on or about July 10, 2002, the IRS asked the CLDC to explain how it selected Hillspoint Wyatt as developer. It is material in the audit of tax-exempt bonds to determine how developers and contractors are selected in order to ensure that private benefit is not involved in the bond issue.

v. On or about July 26, 2002, the CLDC, through its representatives, answered, telling the IRS that the two developers who had responded to the request for proposal had both required "substantial amounts of up front" money. The CLDC further stated that "the team of Hillspoint Wyatt met with all the involved parties and assembled a proposal whereby they would assume all of the risk of the project up front and not require any payments until the CLDC closed on financing (i.e. the issued tax-exempt bonds)."

vi. In conducting its audit of the CLDC's bond issue, on or about August 27, 2002, the IRS asked a second time as to how Hillspoint Wyatt was selected as the project's developer.

vii. In a letter dated September 13, 2002, the CLDC through its representatives answered, stating "The reason that the developers from the RFP process were eliminated was their requirement for an up front payment of money to cover their fees and time spent on the project. The CLDC was not in a position to pay this up front money and instead wanted to find a developer who would work on a deferred basis (i.e., when money from financing or sales became available")." At that time, CLDC representatives knew that the developers who had

responded to the request for proposal had been willing to negotiate the payment of "up front" money, that Hillspoint Wyatt did not differ from those bidders in refusing to pay up front expenses, and that Hillspoint Wyatt had been paid up front money after the CLDC obtained a mortgage on the Meltzer property and before financing became available.

   viii. On or about June 2002, the CLDC applied for tax exempt status by filing a Form 1023 with the Internal Revenue Service (IRS).

   ix. It is material to the application for tax-exempt status of an organization to determine whether the money obtained by the organization seeking such status provides a public benefit, or whether a disproportion of its assets are disbursed for the benefit of a private party.

   x. On or about May 29, 2003, in considering whether the CLDC offered excessive private benefit to any party, the IRS asked the CLDC how Hillspoint Wyatt had been selected to be the developer.

   xi. On June 25, 2003, the CLDC through its representatives responded, stating that candidates other than Hillspoint Wyatt had been eliminated because they had required "up front" costs and that the CLDC was without funds. At that time, CLDC representatives knew that the other candidates had been willing to negotiate the payment of up front costs and that Hillspoint Wyatt had been paid up front costs, notwithstanding its agreement otherwise.

   xii. On September 24, 2003, the IRS approved the CLDC's application for tax exempt status based on the answers provided by the CLDC's representatives. In addition, based upon the answers that the CLDC had provided to the IRS, the IRS entered into a closing agreement with the CLDC that cancelled further payments on the B Series bonds because the IRS concluded the developer fee was excessive for a public project, but the closing agreement did not disallow tax

exempt status to the A Series bonds or the B Series bond.

6.      In exchange for the plea of guilty to 26 U.S.C. § 7206(2), by the CLDC and its continuing compliance with all of the terms of this Plea Agreement, the United States Attorney's Office for the Northern District of New York agrees as follows:

   a.   The United States will bring no further federal criminal charges against the CLDC, its officers directors or agents, for any actions described in the Information, as well as any subsequent failure to file returns or information required by the IRS of the CLDC.

   b.   If the guilty plea to Count 1 of the Information is later withdrawn or vacated, the charges not prosecuted pursuant to this Agreement may be prosecuted, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the reinstatement of any such charges. The Defendant waives any defense or objection to the reinstatement and prosecution of any such charges that are not time-barred by the applicable statute of limitations as of the date of this Agreement.

   c.   The U.S. Attorney's Office reserves the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within Count 1 of the Information.

7.      <u>Sentencing and Sentencing Guidelines Calculation</u>: The Defendant understands that any estimate of the Defendant's total offense level, criminal history score, and/or Sentencing Guidelines range provided before sentencing is preliminary and is not binding on the parties to this Agreement, the Probation Office, or the Court. The U.S. Attorney's Office and the CLDC agree to the following matters concerning sentencing.

   a.   The Sentencing Guideline score applicable to this case is determined by §

2T1.1 and reference to the tax loss tables on § 2T4.1

  b. The tax loss associated with the conduct in this case exceeds $400,000 but does not exceed $1,000,000, which leads to a Guideline offense level of 20.

  c. The Defendant's Culpability Score cannot be definitively determined prior to the completion of the presentence investigation.

8. This Agreement is limited to the U.S. Attorney's Office for the Northern District of New York and cannot bind other federal, state or local prosecuting authorities. Furthermore, this Agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the Defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability.

9. If the Court rejects the provisions of this Agreement permitting the Defendant to plead guilty to 26 U.S.C. § 7206(2) in satisfaction of other charges, the Court will afford the Defendant an opportunity to withdraw his plea of guilty prior to sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) and (d).

10. The Defendant acknowledges that it has read each of the provisions of the entire Plea Agreement with the assistance of counsel and understands its provisions.

  a. The Defendant understands its right to assistance of counsel at every stage of the proceeding and have discussed its constitutional and other rights with defense counsel. The Defendant understands that by entering a plea of guilty, it will be giving up its rights (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; and (v) to

present evidence in its defense.

      b.     The Defendant has been advised by defense counsel of the nature of the charges to which it is entering a guilty plea. The Defendant has further been advised by defense counsel of the nature and range of the possible sentence, as described above.

11.     No promises, agreements or conditions have been entered into between the parties other than those set forth in this Agreement, and none will be entered into unless memorialized on the record at the time of the entry of the plea or unless in writing and signed by all parties. This Agreement, to become effective, must be signed by all of the parties listed below.

ANDREW T. BAXTER
Acting United States Attorney
Northern District of New York

Dated: _March 20_, 2009    By: _____
                                                  Michael C. Olmsted
                                                  Assistant U.S. Attorney

Dated: _March 20_, 2009            _____
                                                    David Burch, Esq.
                                                    Attorney for the CLDC